Hillsborough-southern judicial district
No. 2002-118

CATRINA GRAVES

v.

FRANKLIN L. ESTABROOK

Argued: January 8, 2003
Opinion Issued: March 3, 2003

*Duddy Law Offices*, of Bedford (*Roy A. Duddy* and *Charles V. Moser* on the brief, and *Mr. Duddy* orally), for the plaintiff.

*Desmarais, Ewing & Johnston, PLLC*, of Manchester (*Fred J. Desmarais & a.* on the brief, and *David W. Johnston* by brief and orally), for the defendant.

*James E. Townsend*, of Londonderry, for the New Hampshire Trial Lawyers Association, as *amicus curiae*.

DUGGAN, J. The plaintiff, Catrina Graves, appeals a ruling by the Superior Court (*Hampsey*, J.) granting the defendant, Franklin L. Estabrook's, motion to dismiss her complaint for negligent infliction of emotional distress. Estabook argued that because Graves was not related by blood or marriage to the decedent, but was only the decedent's fiancée, she cannot recover for negligent infliction of emotional distress. We reverse and remand.

We rely upon the facts pled by Graves. In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, we assume the truth of all facts alleged by the plaintiff and construe all reasonable inferences in the light most favorable to her. *Minuteman, LLC v. Microsoft Corp.*, 147 N.H. 634, 636 (2002). If the facts do not constitute a basis for legal relief, we will uphold the granting of the motion to dismiss. *Id.*

Graves was engaged to Brett A. Ennis and had lived with him for approximately seven years. On September 23, 2000, Ennis was riding his motorcycle while Graves followed immediately behind him in a car. At an intersection, Estabrook's vehicle failed to yield at a stop sign and collided with Ennis. As Graves looked on, Ennis flipped over the hood of Estabrook's car and landed on the pavement. Graves immediately stopped her car and ran to the aid of her fiancé. She saw blood coming from his mouth and significant trauma to his head. She followed the ambulance that transported her fiancé to the hospital, stayed by his side while he was being treated, and attempted to comfort his parents and son. Ennis died the next day. Graves alleges that as a result of witnessing the collision and death of her fiancé, she suffered shock, severe mental pain and emotional distress.

The issue before us is whether a plaintiff who lived with and was engaged to marry the decedent may recover for negligent infliction of emotional distress. We hold that she may recover damages for emotional distress as a result of witnessing the collision.

Many of the first States to recognize bystander liability for negligent infliction of emotional distress limited its scope by applying the "physical impact test," without considering foreseeability. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 546-47 (1994). Under the physical impact test, the plaintiff must have sustained a physical impact, no matter how slight, in order to recover. *Id.* New Hampshire never adopted the physical impact test but instead followed the zone of danger rule. *Corso v. Merrill*, 119 N.H. 647, 650 (1979); *Jelly v. LaFlamme*, 108 N.H. 471 (1968); *Cote v. Litawa*, 96 N.H. 174 (1950). We followed this rule because we were concerned that "we would expose a defendant to liability that extended far

beyond his culpability." *Corso*, 119 N.H. at 653. That rule permitted recovery only when the bystander was within a physical zone of danger created by the defendant's negligence. *See Jelly*, 108 N.H. 471.

In *Corso*, however, we rejected the zone of danger rule. *Corso*, 119 N.H. at 658. Instead, we applied the traditional negligence analysis of foreseeability and concluded that "[a]lthough fear of unlimited liability is a valid concern, we now think that this concern must be weighed against a plaintiff's serious emotional injury that is directly caused by defendant's negligence." *Id.* at 653.

We held that "freedom from mental distress is an interest that is today worthy of legal protection" and that in deciding whether a defendant could be held liable, "[t]he key to applying a traditional negligence approach is the doctrine of foreseeability." *Id.* at 651-52; *see Barnhill v. Davis*, 300 N.W.2d 104, 107 (Iowa 1981); *State v. Eaton*, 710 P.2d 1370, 1375 (Nev. 1985); *Clohessy v. Bachelor*, 675 A.2d 852, 862 n. 11 (Conn. 1996) (all citing *Corso*'s traditional approach with approval).

■ We adopted the test first enunciated in *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968), in which the California Supreme Court set forth three factors for determining whether a defendant should reasonably foresee injury to a bystander:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Dillon v. Legg*, 441 P.2d at 920. *Dillon* noted that these three factors are not a rigid framework but "contemplate[] that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen." *Id.* at 921.

This case requires us to examine the scope of *Dillon*'s third factor. The defendant argues that we should continue to follow the California Supreme Court and adopt its subsequent holding in *Elden v. Sheldon*, 758 P.2d 582 (Cal. 1988). There, the court held that unmarried cohabitants are not "closely related" and cannot recover for negligent infliction of emotional distress. *Id.* at 588. Other courts have adopted the same rule. *See Ferretti v. Weber*, 513 So. 2d 1333 (Fla. Dist. Ct. App. 1987); *Sollars v. City of Albuquerque*, 794 F. Supp. 360, 363 (D.N.M. 1992); *Hastie v. Rodriguez*,

716 S.W.2d 675, 676 (Tex. App. 1986). *See generally* Annotation, *Relationship Between Victim And Plaintiff–Witness As Affecting Right To Recover Under State Law For Negligent Infliction Of Emotional Distress Due To Witnessing Injury To Another Where Bystander Plaintiff Is Not Member Of Victim's Immediate Family*, 98 A.L.R.5TH 609 (2002); Note, *It's All Relative: A Graphical Reasoning Model For Liberalizing Recovery For Negligent Infliction Of Emotional Distress Beyond The Immediate Family*, 30 VAL. U. L. REV. 913, 917 (1996) [hereinafter cited as Note].

As noted by the New Jersey Supreme Court in *Dunphy v. Gregor*, 642 A.2d 372, 375 (N.J. 1994), "the [California Supreme Court] in *Elden* was reacting to the experience of the California courts with bystander liability under the *Dillon* standard." After *Dillon*, California courts had significantly expanded the scope of bystander liability. For instance, the supreme court had held that a plaintiff need not visually perceive the injury to the third party. *See Krouse v. Graham*, 562 P.2d 1022, 1031 (Cal. 1977). Other California courts had held that arriving soon after the accident was sufficient to satisfy the first two prongs of *Dillon*. *See, e.g., Nazaroff v. Super. Ct. In And For Cty. Of Santa Cruz*, 145 Cal. Rptr. 657, 664 (Ct. App. 1978); *Archibald v. Braverman*, 79 Cal. Rptr. 723 (Ct. App. 1969). The courts had also broadly interpreted the "closely related" factor. *See Mobaldi v. Board of Regents of University of Cal.*, 127 Cal. Rptr. 720, 726-27 (Ct. App. 1976); *see also Ledger v. Tippitt*, 210 Cal. Rptr. 814, 824-28 (Ct. App. 1985). Thus, one reason for the holding in *Elden* was a need to rein in the expansion of bystander liability in California.

There has been no comparable expansion of the scope of bystander liability in New Hampshire. Indeed, in *Corso*, we emphasized the limits of bystander liability.

> Plaintiff's burden of proving causation in fact should not be minimized. The emotional injury must be directly attributable to the emotional impact of the plaintiff's observation or contemporaneous sensory perception of the accident and immediate viewing of the accident victim. Therefore, recovery will not be permitted for emotional distress when the plaintiff is merely informed of the matter after the accident or for the grief that may follow from the death of the related accident victim.

*Corso*, 119 N.H. at 656.

We subsequently have adhered to the limitations created in *Corso*. For example, in *Nutter v. Frisbee Memorial Hospital*, 124 N.H. 791 (1984), we refused to expand liability to plaintiffs who reached the hospital shortly after their child died. We cautioned that a "rule that permitted

recovery ... would create a potential cause of action in every parent who learned, by any reasonable means, of his or her child's negligently inflicted death or injury, and as a result suffered emotional injury manifested by physical symptoms." *Id.* at 796. In *Wilder v. City of Keene*, 131 N.H. 599 (1989), we refused to expand liability to parents who did not witness the accident but observed their child *in extremis* at the hospital. We reaffirmed the requirement that plaintiffs be "sufficiently close to the accident scene to experience a sensory perception of the event." *Id.* at 604. And, in *Jarvis v. Prudential Insurance*, 122 N.H. 648 (1982), where the plaintiff alleged emotional distress caused by the denial of health insurance benefits to her husband, we held the plaintiff's reliance on *Corso* was "misplaced." *Id.* at 653. Our cases, thus, have continued to narrowly construe *Corso* and, unlike the California Supreme Court, we are not faced with a need to curb bystander liability.

Notwithstanding this difference, the defendant urges us to construe the third factor of *Corso* literally. He argues that we should limit the meaning of "closely related" to a dictionary definition: people "connected by consanguinity," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1916 (unabridged ed. 1961), or "persons connected by kinship, common origin or marriage." AMERICAN HERITAGE DICTIONARY 1473 (4th ed. 2000).

*Corso*, however, did not modify the phrase "closely related" with "by blood or marriage." *Corso*, 119 N.H. at 654. Rather, "closely related" was "contrasted with an absence [of a] relationship or the presence of only a distant relationship." *Id.* *Corso* established only that mental distress suffered by a plaintiff who is closely related is foreseeable and a plaintiff with no relationship is not foreseeable. *Id.* The defendant's argument, limiting the analysis to a dictionary definition, amounts to a "dry classification [that] puts the emphasis at the wrong place[]." *Ouellette v. Blanchard*, 116 N.H. 552, 556 (1976) (abandoning distinctions between invitee, licensee and trespasser by adopting traditional negligence principles). The appropriate analysis is not to resort to a dictionary definition but rather to use our traditional analysis of foreseeability.

In *Elden*, the California Supreme Court rejected a traditional analysis of foreseeability for three policy reasons: first, the State's strong interest in marriage; second, the potential invasion into an unmarried plaintiff's privacy required to prove a close relationship; and third, the need to limit the class of plaintiffs by a bright line rule. *Elden*, 758 P.2d at 586-88. We examine each reason in turn.

First is the State's strong interest in marriage. In *Elden*, the court stated that "to the extent unmarried cohabitants are granted the same rights as married persons, the state's interest in promoting marriage is

inhibited." *Id.* at 586. The court noted the abolition of common law marriage as evidence of the public policy in favor of formal marriage. *Id.* at 587. *Elden* found no convincing reason to permit recovery to couples who bear no legal obligations to each other to the same extent as those who undertake such obligations. *Id.*

The court in *Elden* apparently relied upon the dubious assumption that the possibility of recovery in tort litigation is an incentive to marry. Rejecting this assumption, the New Jersey Supreme Court observed that "a person who would not otherwise choose to marry would not be persuaded to do so in order to assure his or her legal standing in a future personal injury action should that person have the misfortune of witnessing the serious injury of his or her spouse." *Dunphy*, 642 A.2d at 379. The court noted that "[m]arriage will still maintain its preferential status under the law" and that allowing recovery "will not discourage marriage as a worthwhile and desirable relationship or erode society's commitment to the institution of marriage." *Id.* We agree.

The second reason relied upon in *Elden* was the "difficult burden on the courts." *Elden*, 758 P.2d at 587. *Elden* reasoned that "[a] determination whether a partner in an unmarried cohabitation relationship may recover damages for emotional distress based on such matters as the sexual fidelity of the parties and their emotional and economic ties would require a court to undertake a massive intrusion into the private life of the partners." *Id.*

Again, we agree with the New Jersey Supreme Court, which noted that "[o]ur courts have shown that the sound assessment of the quality of interpersonal relationships is not beyond a jury's ken and that courts are capable of dealing with the realities, not simply the legalities, of relationships to assure that resulting emotional injury is genuine and deserving of compensation." *Dunphy*, 642 A.2d at 378. Moreover, inquiry into the quality and intimacy of a relationship is often necessary in loss of consortium cases. *See, e.g., id.* at 378; *Labonte v. National Gypsum Co.*, 113 N.H. 678, 682-83 (1973). Engaging in a similar inquiry in the instant case breaks no new ground.

Furthermore, the real burden is not on the court but on the plaintiff who chooses to seek recovery for negligent infliction of emotional distress. At the outset, the plaintiff will know that the details of the relationship with the decedent will be examined and that this may involve an intrusion into the plaintiff's private life. The decision to submit to this searching inquiry is the plaintiff's choice and should not be the basis for limiting liability.

Third, the court in *Elden* relied upon "the need to limit the number of persons to whom a negligent defendant owes a duty of care." *Elden*, 758 P.2d at 588. The court noted that "[i]t would be an entirely unreasonable

burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as his friends." *Id.* (quotation omitted). The court stated that the absence of a bright line rule "would result in the unreasonable extension of the scope of liability of a negligent actor." *Id.* While admitting that the "close emotional ties between unrelated or distantly related persons is often strong" and "the result of injury ... may be as devastating as that suffered by a member of the immediate family," the court concluded that "[t]he problems of multiplication of actions and damages that would result from such an extension of liability would place an intolerable burden on society." *Id.* (citations and quotations omitted.)

Rejecting the bright line rule in *Elden*, however, does not place an intolerable burden upon society or unfair burden upon a negligent defendant. Rather, it allows recovery for an eminently foreseeable class of plaintiffs. This class of plaintiffs is further narrowed by "the other elements of the bystander cause of action, such as contemporaneous observation, death or serious injury to the victim, and severe emotional injury to the plaintiff, [that] structure the kind of 'particularized foreseeability' that ensures that the class of plaintiffs is reduced even further and that limitless liability is avoided." Note, *supra* at 947.

*Elden* argued that "[t]he need to draw a bright line in this area of the law is essential" because there is no "principled distinction between an unmarried cohabitant who claims to have a de facto marriage relationship with his partner and de facto siblings, parents, grandparents or children." *Elden*, 758 P.2d at 588. While this observation is accurate, it fails to consider that there is also no logical distinction between denying recovery to a fiancée who has lived with her betrothed for seven years and allowing recovery to a wife who met and married her husband a week before the accident. *See State, Dep't. of Transp. v. Hill*, 963 P.2d 480, 483 (Nev. 1998) (characterizing recovery after the wedding, but not beforehand, as "fallacious"). A bright line rule that includes only individuals related by blood or marriage is

> overinclusive because it permits recovery when the suffering accompanies a legal or biological link between bystander and victim, regardless of whether the relationship between the two is estranged, alienated, or in some other way removed. Conversely, the [rule] is underinclusive because it arbitrarily denies court

access to persons with valid claims that they could prove if permitted to do so.

Note, *supra* at 917.

More fundamentally, we decline to adopt a bright line rule when a "flexible approach, designed to account for factual nuances" is available. *See Quirk v. Town of New Boston*, 140 N.H. 124, 131 (1995); *see also State v. Reid*, 135 N.H. 376 (1992). Foreseeability accounts for factual nuances, while a bright line rule is at odds with foreseeability. This is the rationale of *Corso*.

*Corso* rejected the bright line "zone of danger" rule as a "mechanical rule that does more harm than good." *Corso*, 119 N.H. at 656 (quotation omitted). Instead, we relied upon the traditional test of foreseeability, observing "that the adoption of well-defined foreseeability factors will not lead to unlimited liability, and that the threat of remote and unexpected liability is not a substantial fear." *Id.* In this regard, we agree with the New Jersey Supreme Court that the expedience of a bright line rule "does not outweigh the need to recognize claims that are legitimate and just." *Dunphy*, 642 A.2d at 378. We therefore find unpersuasive the argument in *Elden* that a bright line rule is necessary.

We conclude that "to foreclose [an unmarried cohabitant] from making a claim based upon emotional harm because her relationship with the injured person does not carry a particular label is to work a potential injustice . . . where the emotional injury is genuine and substantial and is based upon a relationship of significant duration that . . . is deep, lasting and genuinely intimate." *Id.* A number of courts have reached a similar conclusion. *See Thurman v. Sellers*, 62 S.W.3d 145, 164 (Tenn. Ct. App. 2001); *Heldreth v. Marrs*, 425 S.E.2d 157, 162-63 (W. Va. 1992); *James v. Lieb*, 375 N.W.2d 109, 115 (Neb. 1985); *Paugh v. Hanks*, 451 N.E.2d 759, 766-67 (Ohio 1983); *Sinn v. Burd*, 404 A.2d 672, 685 (Pa. 1979); *Leong v. Takasaki*, 520 P.2d 758, 766 (Haw. 1974). *See generally*, Annotation, 98 A.L.R.5TH 609.

■ We thus recognize that unmarried cohabitants may have a close relationship, *i.e.*, a "relationship that is stable, enduring, substantial, and mutually supportive . . . cemented by strong emotional bonds and provid[ing] a deep and pervasive emotional security." *Dunphy*, 642 A.2d at 380. In determining whether a relationship meets this standard, a court should

take into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . .

whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Id.* at 378 (quotation omitted).

 In this case, the plaintiff alleged in her complaint that she was engaged to the decedent and that they had lived together for seven years immediately preceding the accident. Construing all reasonable inferences in the light most favorable to the plaintiff, *Minuteman, LLC v. Microsoft Corp.*, 147 N.H. at 636, we conclude that it is reasonable to infer that in the course of their lengthy cohabitation the plaintiff and her fiancé enjoyed mutual dependence, common contributions to a life together, emotional reliance on each other and attended to life's mundane requirements together. We conclude that the pleadings are reasonably susceptible of a construction that would withstand a motion to dismiss.

*Reversed and remanded.*

BRODERICK and NADEAU, JJ., concurred; DALIANIS, J., with whom BROCK, C.J., joined, dissented.

DALIANIS, J. dissenting. Because I believe that the class of bystanders who may recover for negligent infliction of emotional distress should be limited to those closely related to the victim by marriage or blood, I respectfully dissent.

In *Corso v. Merrill*, 119 N.H. 647 (1979), we abandoned the "zone of danger" standard which barred recovery unless the plaintiff had been exposed to a risk of physical harm, and instead permitted bystander recovery for negligent infliction of emotional distress premised upon a traditional test of foreseeability. *Id.* at 657. In expanding this cause of action, we recognized the need to permit recovery for a "plaintiff's serious emotional injury that is directly caused by [the] defendant's negligence." *Id.* at 653. At the same time, however, "we recognized the need for a clearly-defined boundary to liability in this area . . . ." *Nutter v. Frisbie Mem. Hosp.*, 124 N.H. 791, 795 (1984). This necessity arises because the liability of a negligent defendant to a bystander is largely derivative. *Id.* at 794. "The risks of indirect harm from the loss or injury of loved ones [are] pervasive and inevitably realized at one time or another." *Id.* (quotation omitted). To recognize liability for all such harms, however, would impose "remote and unexpected liability" upon defendants in bystander cases. *See Corso*, 119 N.H. at 656. While it is difficult to determine the point at which

the harm is no longer reasonably foreseeable to a defendant, "[t]he fact that such a boundary is difficult to draw does not obviate the reasons for drawing it." *Nutter*, 124 N.H. at 795.

In establishing a clearly-defined boundary to liability, we must balance the need to compensate those plaintiffs whose injuries derive from the defendant's negligence with the need to avoid both infinite liability and uncertainty in the law. *See Wilder v. City of Keene*, 131 N.H. 599, 603 (1989). Thus, we have narrowly construed the foreseeability factors that we adopted in *Corso* to achieve this balance by "clearly limiting bystander recovery to those plaintiffs whose injuries were most directly and foreseeably caused by a defendant's negligence." *Nutter*, 124 N.H. at 795.

The policy goals of limited liability and certainty of the law cannot be achieved if the class of plaintiffs who may recover is based upon the subjective emotional connection of the parties. Rather, we should narrowly construe the "closely related" factor by limiting recovery with objective standards that clearly define the defendant's liability. *See Grotts v. Zahner*, 989 P.2d 415, 417 n.6 (Nev. 1999). Accordingly, I would restrict the class of plaintiffs who may recover under this cause of action to those closely related to the victim by the objective criteria of blood or marriage.

The majority's interpretation of the "closely related" factor is "so ambiguous as to limit the class of plaintiffs who could assert a claim for [negligent infliction of emotional distress] only by the imagination of counsel drafting the pleadings." *Lindsey v. Visitec, Inc.*, 804 F. Supp. 1340, 1344 (W.D. Wash. 1992) (quotation omitted). If the emotional connection between the bystander and the victim determines whether they are "closely related," there is no principled distinction, for example, between an unmarried cohabitant who claims to have a sufficiently "intimate" relationship with the victim and close friends who claim the same intimacy. *See Elden v. Sheldon*, 758 P.2d 582, 588 (Cal. 1988). I disagree with the New Jersey Supreme Court's holding in *Dunphy v. Gregor*, 642 A.2d 372, 378 (N.J. 1994), that a standard that "take[s] into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, [and] the extent and quality of shared experience" properly confines this cause of action within a well-defined boundary. To the contrary, the "application of these factors would not provide a sufficiently definite and predictable test to allow for consistent application from case to case." *Elden*, 758 P.2d at 587; *see also Nutter*, 124 N.H. at 795 (recognizing the need to avoid uncertainty in the law).

If the class of potential plaintiffs who may recover is extended beyond those closely related to the victim by blood or marriage, courts will face difficult problems of proof in determining whether the relationship is sufficiently close to permit recovery. *See Elden*, 758 P.2d at 587. Under the

majority's holding, courts will be compelled to define and make findings about the subjective emotional connection between the parties in an attempt to determine whether the plaintiff's emotional trauma was reasonably foreseeable to the defendant. Adopting such a standard will extend this cause of action beyond that contemplated by *Corso*.

Thus, I would not expand the class of potential plaintiffs beyond those closely related to the victim by the objective criteria of marriage or blood. While I recognize that "[s]uch limitations are indisputably arbitrary since it is foreseeable that in some cases unrelated persons have a relationship to the victim or are so affected by the traumatic event that they suffer equivalent emotional distress," *Thing v. La Chusa*, 771 P.2d 814, 828 (Cal. 1989), defining the class of "closely related" bystanders by the depth of their emotional connection to the victim would unreasonably expand the defendant's liability. *See Elden*, 758 P.2d at 588.

The majority declines to adopt a bright line rule in favor of a "flexible approach" to account for "factual nuances." I fail to see how adopting a bright line rule here is any different from the bright line rule that we have followed with regard to the contemporaneous observation factor. We have denied recovery to parents who viewed their deceased child in the hospital after the accident, *see Nutter*, 124 N.H. at 795-96, and to parents who observed their child *in extremis* within one hour of the accident, *see Wilder*, 131 N.H. at 603-04. We did so, not because we deemed the parents' emotional trauma unforeseeable to the defendant, but rather as a means of reasonably limiting the defendant's liability. *See Wilder*, 131 N.H. at 604; *Nutter*, 124 N.H. at 795-96.

We have heretofore avoided expanding the scope of bystander liability. We have done so by narrowly construing the *Corso* factors and by establishing clearly defined boundaries to the cause of action. I see no reason to depart from this practice, and, therefore, I would affirm.

BROCK, C.J., joins in the dissent.